2025 UT App 36

# THE UTAH COURT OF APPEALS

KRISTI RAGSDALE,
Appellee and Cross-appellant,

*v.*

GEORGE FISHLER,
Appellant and Cross-appellee.

Opinion
No. 20230023-CA
Filed March 13, 2025

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 170903926

Karthik Nadesan, Attorney for
Appellant and Cross-appellee

Stacy J. McNeill and James C. Dunkelberger,
Attorneys for Appellee and Cross-appellant

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

ORME, Judge:

¶1      For over ten years, George Fishler has shown his vehement opposition to Kristi Ragsdale operating her residential treatment center in his neighborhood by displaying provocative yard signs and by mouthing or shouting profanities, coupled with rude hand gestures, at anybody entering, leaving, or on the business's property. Ragsdale sought a civil stalking injunction against Fishler, which the district court denied following the first evidentiary hearing in this matter. Our Supreme Court reversed the denial and remanded the matter back to the district court. On remand, following a second evidentiary hearing, the district court granted an injunction in Ragsdale's favor.

¶2    On appeal, Fishler argues (1) that the court erred in concluding that his conduct amounted to stalking and (2) that the injunction violates his right to free speech under the First Amendment to the United States Constitution. Ragsdale cross-appeals, contending that the court erred in not including in the injunction a proposed provision enjoining Fishler from displaying signs in his yard. She also asserts that the court abused its discretion when it denied her request for attorney fees. We largely affirm the district court, although we remand the matter with instructions that the court make adjustments to one of the injunction's provisions to better comply with the First Amendment.

BACKGROUND[1]

¶3    Ragsdale is the founder and owner of the Eva Carlston Academy (ECA)—a residential treatment center for adolescent girls experiencing mental health issues, including anxiety and depression. In 2013, ECA opened a location at the end of a cul-de-sac in a Salt Lake-area neighborhood. Fishler and his wife are long-time residents of the cul-de-sac. Their home is located directly north of ECA.

¶4    Fishler and other neighbors vehemently opposed the opening of the ECA location in their neighborhood. Several neighbors voiced their opposition at community council meetings and displayed yard signs concerning "commercial businesses 'invading' the neighborhood." Fishler drafted a flier that he distributed to neighbors that stated, without specifically identifying Ragsdale or ECA, that the "commercial enterprise will

---

1. "In the context of a civil stalking injunction, we will recite the facts in a light most favorable to the trial court's findings." *Anderson v. Deem*, 2023 UT App 48, n.1, 530 P.3d 945 (quotation simplified).

degrade th[e] neighborhood" and urged neighbors to contact the local authorities.

¶5     Despite Fishler's and the neighbors' efforts, ECA was able to obtain the necessary permits, and it began operating in the cul-de-sac. Believing that the resulting noise and traffic "ruined the neighborhood," Fishler continued to "protest" ECA. He did so by displaying two yard signs—one in the front and one in the back of his property—stating,

> TROUBLED TEEN
> MONEY MACHINE
> BECOME DISABLED
> FOR ONLY
> $10,000/MONTH

and another sign at the front of his property stating, "DELIVER US FROM EVA." These signs have remained on Fishler's property for many years. Additionally, whenever Fishler saw Ragsdale, he would hold up his middle finger and sometimes mouth or shout profanities at her. Fishler exhibited the same behavior toward others on ECA property and vehicles leaving or arriving at ECA. Fishler would also raise his middle finger toward the ECA building whenever he drove past it. Fishler did not alter this conduct even after ECA responded by installing security cameras.

¶6     In June 2017, Ragsdale sought a civil stalking injunction against Fishler. She obtained a temporary stalking injunction that same day, which was served on Fishler a little over a week later. Fishler requested a hearing on the matter. In August 2017, following a two-day evidentiary hearing, the district court revoked the temporary stalking injunction and denied Ragsdale's

petition for a civil stalking injunction. The court denied Fishler's subsequent request for attorney fees.[2]

¶7 Both parties appealed the district court's rulings, culminating in our Supreme Court's decision in *Ragsdale v. Fishler* (*Ragsdale I*), 2021 UT 29, 491 P.3d 835. The Court reversed the denial of the civil stalking injunction, ruling that the district court (1) erroneously concluded that Fishler's course of conduct could not be directed at Ragsdale based on the court's "mistaken understanding that Mr. Fishler could direct his conduct only at . . . his subjectively intended target," *id.* ¶ 43; (2) failed to determine whether Fishler's conduct would cause a reasonable person in Ragsdale's circumstances to suffer fear or emotional distress, *id.* ¶ 49; and (3) erred in ending its analysis with the conclusion that Fishler's signs and conduct constituted protected "political speech" under the First Amendment without also analyzing whether the requested injunction "fell within the stalking statute's parameters" and whether the proposed injunction constituted a content-based or content-neutral restraint on speech, *id.* ¶¶ 54–56 (quotation simplified). Accordingly, our Supreme Court remanded the case to the district court with instructions "to rule anew on whether Mr. Fishler directed his conduct at Ms. Ragsdale, whether his conduct would cause a reasonable person in Ms. Ragsdale's circumstances fear or emotional distress, and whether Ms. Ragsdale's [proposed] injunction burdens more speech than necessary." *Id.* ¶ 66. The Court also vacated the district court's denial of Fishler's attorney fees request and noted

---

2. Judge Katherine Bernards-Goodman presided over the first evidentiary hearing and retired shortly after denying the civil stalking injunction. Judge Amber M. Mettler thereafter denied Fishler's attorney fees request, held the second evidentiary hearing on remand from our Supreme Court, and ultimately granted the civil stalking injunction that is the subject of the current appeal.

"that either party may make a new fee request following the district court's final judgment on remand." *Id.* ¶ 65.

¶8      On remand, in May 2022, the district court held a second two-day evidentiary hearing on Ragsdale's petition for a civil stalking injunction. A few months later, the court issued its Findings of Fact, Conclusions of Law, and Order.

¶9      In addition to the findings described above, the district court noted Ragsdale's testimony that Fishler's conduct escalated after the 2017 denial of the civil stalking injunction. The court stated that this assertion was consistent with Fishler's testimony, as summarized by the court, that he "did not think his conduct would cause anyone emotional distress or cause anyone to fear for their safety because 'he won' and because 'the Third District Court said it was political speech and it was allowed.'" Fishler said that because "he spent tens of thousands of dollars on his free speech," he "might as well use it." Fishler testified that he ceased raising his middle finger and mouthing profanities after our Supreme Court issued its decision in 2020,[3] but the district court did not find this testimony to be credible, particularly in light of Ragsdale's and another ECA employee's testimony to the contrary.[4]

¶10      Several ECA employees testified at the second evidentiary hearing regarding Fishler's conduct toward them and Ragsdale

---

3. Our Supreme Court initially issued its decision in August 2020, *see Ragsdale v. Fishler*, 2020 UT 56, but following Fishler's petition for a rehearing, the Court issued an amended opinion in July 2021 to correct two factual errors, *see Ragsdale I*, 2021 UT 29, n.1, 491 P.3d 835.

4. The ECA employee in question testified that as recently as April 2022, Fishler "flipped her off and mouthed 'fucking asshole'" at her.

over the years. They each testified regarding numerous interactions with Fishler in which he would most commonly flip them off and mouth "fuck you," "asshole," or some variation thereof at them. Some employees testified that they witnessed Fishler exhibit the same kind of behavior toward Ragsdale and others. The employees each testified that such conduct had caused them to feel anxious, scared, distressed, uncomfortable, angry, and/or threatened. The district court noted that "a number of" employees became "visibly emotional" during their testimony. It also found the employees' testimony to be "particularly credible" and "their descriptions of [Fishler's] conduct, his hateful demeanor, and the deleterious effect of [his] behavior on them and on" Ragsdale to be "detailed and consistent."

¶11   Ragsdale testified that Fishler's behavior causes her to fear for her own safety, as well as for that of ECA employees and residents. The court found that Ragsdale "experiences anxiety every day as a result of [Fishler's] conduct." The court found that Ragsdale worries about what Fishler will say or do, that his conduct might negatively affect ECA's residents, and that his conduct will affect the business by causing parents to worry for their daughters' safety. As a result of the anxiety, Ragsdale attends therapy and takes anti-anxiety medication. She also drives different vehicles home in an effort to prevent Fishler from recognizing her.

¶12   The district court reviewed the transcript of the first evidentiary hearing in which Fishler testified, as summarized by the court, "that his conduct was intended to protest ECA," that "it was not directed towards any specific person," "that it was not for the purpose of scaring anyone," and "that he never interpreted anyone's reaction as expressing fear or emotional distress." Fishler also "credibly" testified at the first evidentiary hearing that he did not know what Ragsdale looked like until she appeared at the first hearing. But the court found that after that hearing, Fishler knew who Ragsdale was, what vehicle she drove,

and that his conduct "was extremely upsetting" to her and others at ECA.

¶13     The court also found that in early 2021, Fishler put up yet another sign on his property stating,

> STOP THE ABUSE
> SIGN THE PETITION
> INVESTIGATE
> EVA CARLSTON ACADEMY
> FOR EMOTIONAL ABUSE

The sign also included a link and QR code for an online petition that visitors could sign. The petition, which was initially posted online in 2019, alleged that ECA treated its residents poorly, and it requested that ECA be investigated and "hopefully shut down."[5] Signers of the petition left comments, some of which included death threats aimed at Ragsdale and disclosed her personal information. The court found that this new sign caused Ragsdale to fear for her safety because the comments on the linked petition threatened her by name and included her personal information. Fishler, who did not author the petition, testified that after he became aware of the petition, he signed it and decided to post the yard sign directing readers to the petition. The court found that although Fishler did not post a comment on the petition himself, he saw at least some of the threatening comments. The petition was eventually removed from the hosting website, and Fishler took down that one sign shortly before the second evidentiary hearing.

¶14     Turning next to its conclusions of law, the district court first addressed whether Fishler's conduct constituted stalking, as

---

5. Ragsdale denies the online petition's allegations.

defined by Utah Code section 76-5-106.5 (the stalking statute). The court held that Fishler's

> conduct of yelling and mouthing obscenities, flipping off anyone coming or going from ECA, driving by ECA and flipping off any and everyone at ECA, and posting signs about ECA amounts to communicating to [Ragsdale] directly and indirectly through ECA staff and clients, communicating about [her] with ECA staff and clients, confronting [her], and contacting [her] coworkers at ECA, and, therefore, constitutes a course of conduct directed at [Ragsdale].

¶15 The court next addressed whether this course of conduct would cause a reasonable person in Ragsdale's circumstances to fear for their own safety or for that of another. The court disagreed with Fishler's argument that it did not because he had been engaging in the same course of conduct for almost 10 years without ever physically assaulting anyone, he never expressly threatened anyone, and Ragsdale and others at ECA were always "in a position of safety" during the confrontations. The court held that a nearly "10-year campaign of harassment in a quiet, residential neighborhood involving hundreds of interactions after being told that your conduct is causing another person to be afraid would cause *any* reasonable person to be afraid for his or her safety and the safety of others" and that "the cumulative effect of [Fishler's] conduct is particularly fear-inducing given that it demonstrates obsessive and unreasonable behavior on [his] part." The court stated that this especially applied to someone in Ragsdale's position "as the owner of a business that is responsible for the safety and well-being of girls and young women who are living at a facility owned and operated by the business." The court further held that posting a sign directing readers to a petition containing comments threatening Ragsdale by name and

revealing her personal information could cause a reasonable person in her shoes to fear for their safety.

¶16 For much the same reasons, the court concluded that Fishler's course of conduct also would have unquestionably caused a reasonable person in Ragsdale's circumstances to suffer emotional distress. While "certainly not dispositive," the court first noted that Ragsdale and almost every ECA employee who testified "became emotional" when describing how Fishler's "constant and angry conduct made them feel nervous, anxious, and on edge, the cumulative effect of which is unquestionably significant mental and psychological suffering." The court held that "[t]he constant yelling and mouthing of obscenities and flipping off over the course of nearly 10 years in an otherwise quiet neighborhood, literally every time an ECA-affiliated individual crosses paths with [Fishler] would cause any reasonable person to suffer significant mental and psychological suffering." Additionally, the court held that Fishler's conduct could cause a reasonable person in Ragsdale's position as a business owner to "suffer emotional distress as a result of the potential damage to her livelihood." The court also indicated that "the fact that [Fishler] was fully aware of the effect his conduct was having on [Ragsdale] and others at ECA makes it all the more likely that a reasonable person would suffer emotional distress as a result of [his] behavior."

¶17 The court rejected Fishler's argument that the repetitiveness and consistency of the offending conduct over the course of several years "should have decreased any shock or discomfort that [Ragsdale] experienced." The court stated that this assertion "is contrary to human experience" and that any such holding would only encourage individuals "to engage in stalking for as long as possible in order to argue that the petitioner should somehow be desensitized to the conduct." The court further stated that although Ragsdale did not witness every single interaction between Fishler and others, she, as the owner of ECA,

is responsible for ECA staff and residents and she thus reasonably would have been apprised of any incidents she did not directly witness.

¶18     After also finding that Fishler knew or should have known the effect his conduct would have on a reasonable person, the court concluded that Ragsdale had shown by a preponderance of the evidence that Fishler's conduct amounted to stalking.

¶19     The court next addressed Fishler's argument that even if his conduct constituted stalking, any restraint on that conduct violated the First Amendment for being content-based. The court disagreed, stating that "[t]he focus of the stalking statute and the Court's analysis is on the *effect* of [Fishler's] *conduct* on a reasonable person in [Ragsdale's] circumstances, and not on the content of any message or communication." The court reiterated that Fishler's "conduct amounts to stalking largely because he has engaged in the conduct consistently, over a period of many years, and despite learning that it causes recipients to fear for [their] safety and to suffer emotional distress."

¶20     The court also held that even if the resulting prohibition was content-based, the speech at issue relates to "matters of private, as opposed to public, concern and does not constitute political speech." The court stated that Fishler's speech consisted of yelling or mouthing profanities; "[h]olding up his middle finger, sometimes while aggressively shaking his arm/hand"; posting signs stating,

TROUBLED TEEN
MONEY MACHINE
BECOME DISABLED
FOR ONLY
$10,000/MONTH

and

DELIVER US FROM EVA

and posting another sign stating,

STOP THE ABUSE
SIGN THE PETITION
INVESTIGATE
EVA CARLSTON ACADEMY
FOR EMOTIONAL ABUSE

and directing readers to the online petition that included comments threatening Ragsdale and revealing her personal information. The court stated that other than possibly the sign directing readers to the online petition, none of the other forms of speech at issue "relates to any issues of interest to society at large." The court also noted that the speech occurred "on a dead-end street in a quiet, residential neighborhood usually with no one else around" and that Fishler's "messages—yelling and mouthing obscenities, and posting signs suggesting one can become 'disabled' for a price—do not seek to inform the public about concerns related to operating a business in a residential neighborhood" or any information at all, for that matter.

¶21 Lastly, citing *Ragsdale I*, 2021 UT 29, 491 P.3d 835, the court held that even if Fishler's conduct constituted political speech, the First Amendment did not necessarily shield him from a civil stalking injunction. *See id.* ¶ 50. The court then proceeded to follow *Ragsdale I*'s directive to evaluate "whether each provision of a proposed injunction is content-based or content-neutral, and [to then] evaluate each provision under the corresponding level of scrutiny." *Id.* ¶ 55. The civil stalking injunction Ragsdale proposed contained the following provisions that are relevant to the current appeal:

- "Personal Conduct Order. [Fishler] shall not follow, threaten, annoy, harass, or otherwise stalk [Ragsdale]."

- "No Contact Order. [Fishler] shall not directly or indirectly contact, communicate with, or gesture to [Ragsdale] or her coworkers. [Fishler] shall not directly or indirectly contact, communicate with, or gesture to others as they enter or exit [ECA] or while they are located on the ECA premises."

- "Other Orders. [Fishler] shall take down the signs currently posted on his property and refrain from posting any additional signage on his property that he knows or reasonably should know threatens, annoys, harasses, communicates to, or otherwise causes [Ragsdale] distress."

¶22 The court concluded that in a modified form,[6] the Personal Conduct Order was content-neutral "because it does not draw any distinction based on any message conveyed by [Fishler]" and that it "does not burden more speech than necessary to accomplish the goal of protecting [Ragsdale] from being stalked." For similar reasons, the court held that a modified version of the No Contact Order was content-neutral and did not "burden more speech than necessary." But the court held the proposed "Other Orders" provision was "content-based because whether any particular sign would be prohibited by the injunction cannot be determined without reference to and evaluation of the content or subject matter of the sign and, therefore, [it is] subject to strict scrutiny." The court thus ruled against including this proposed provision in the final injunction. But the court noted that "[b]y not enjoining the posting of any particular signage," it was not suggesting "that the posting of a sign(s) cannot constitute stalking and/or that it is permitted by the injunction."

---

6. The district court made modifications to the proposed Personal Conduct Order and No Contact Order provisions. *See infra* ¶ 23.

¶23 In light of these holdings, the district court issued a stalking injunction against Fishler containing the following provisions:

> 1. <u>Personal Conduct Order</u>. Do not stalk [Ragsdale]. This means you must not follow, threaten, annoy, harass, or cause distress to [Ragsdale]. For a legal definition of stalking, *see* Utah Code 76-5-106.5.
>
> 2. <u>No Contact Order</u>. Do not contact, phone, text, mail, e-mail or communicate either directly or indirectly in any way with [Ragsdale]. Do not contact, communicate with, or gesture to others as they enter or exit [ECA] or while they are located on the ECA premises.

¶24 Ragsdale subsequently filed a motion seeking an award of over $100,000 in attorney fees and costs. Neither party requested a hearing, and the district court entered an order denying the motion.

¶25 Fishler appeals, and Ragsdale cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶26 Fishler first argues that the district court erred in concluding that his course of conduct would have caused a reasonable person in Ragsdale's circumstances to fear for their safety and to suffer emotional distress. "The question of whether a reasonable person would suffer fear or emotional distress under the circumstances is a question of fact that we review for clear error." *Noel v. James*, 2022 UT App 33, ¶ 10, 507 P.3d 832 (quotation simplified). *See Ragsdale I*, 2021 UT 29, ¶ 16, 491 P.3d 835. "A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made."

*Richins v. Weldon*, 2023 UT App 147, ¶ 64, 541 P.3d 274 (quotation simplified). And "we review the district court's interpretation and application of the underlying legal standard for correctness." *Noel*, 2022 UT App 33, ¶ 10 (quotation simplified).

¶27　Fishler next challenges the civil stalking injunction on First Amendment grounds. He argues that as applied to him, the stalking statute is unconstitutional.[7] "We review the

---

7. Fishler raises two other First Amendment challenges. First, he argues that the district court erred in concluding that his conduct did not constitute protected political speech. But Fishler's argument wholly omits any discussion of how the presence of political speech affects the First Amendment analysis, particularly the inquiry into whether the stalking injunction constituted a content-based or content-neutral restriction on his speech. *See Ragsdale I*, 2021 UT 29, ¶ 55, 491 P.3d 835. Instead, as elaborated upon in Part II below, he argues that the civil stalking injunction was entitled to strict scrutiny because it constituted a content-based restriction. Because the district court concluded that the No Contact Order part of the civil stalking injunction was content-neutral regardless of whether Fishler's conduct amounted to political speech—which holding we affirm in Part II.A.—and because we remand to the district court to make adjustments to portions of the Personal Conduct Order that we hold are content-based in Part II.B., we have no need to address this additional argument.

Second, Fishler argues that the stalking statute is unconstitutionally overbroad. Because this argument is not preserved, and because Fishler has not argued an exception to our preservation rule, we do not address it. *See Donjuan v. McDermott*, 2011 UT 72, ¶ 21, 266 P.3d 839 ("Generally, the fact that a party is asserting constitutional claims does not excuse him from complying with the preservation rule."). Fishler asserts that his

(continued…)

interpretation of the federal constitution for correctness." *Ragsdale I*, 2021 UT 29, ¶ 17. *See Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 ("Constitutional issues . . . are questions of law that we review for correctness.") (quotation simplified).

¶28 On cross-appeal, Ragsdale raises another First Amendment issue, contending that the court erred in holding that enjoining Fishler from displaying signs directed at her constituted a content-based restriction on speech. We likewise review this argument for correctness. *See Ragsdale I*, 2021 UT 29, ¶ 17.

¶29 Next, Ragsdale challenges the district court's denial of her motion for attorney fees. "When a statute grants discretion to district courts to assess attorney fees, if appropriate, after considering the facts of the case, we review that assessment for abuse of discretion." *Id.* ¶ 18 (quotation simplified). "A district court abuses its discretion only if no reasonable person would take the view adopted by the trial court." *North Fork Meadows*

---

overbreadth challenge is preserved because, as he sees it, the district court raised and analyzed the issue sua sponte in its findings of fact and conclusions of law. *See Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 42, 361 P.3d 63 ("Where a district court itself raises and then resolves an issue sua sponte, it obviously had an opportunity to rule on the issue. This satisfies the basic purpose of the preservation rule."). We disagree. "A statute may be struck for overbreadth if a petitioner successfully argues (1) the statute reaches a substantial amount of constitutionally protected conduct and (2) the statute is not readily subject to a narrowing construction." *State v. Miller*, 2023 UT 3, ¶ 74 n.7, 527 P.3d 1087 (quotation simplified). Because the district court engaged in no such analysis in its findings and conclusions, this issue was not preserved.

*Owners Ass'n v. Dove*, 2023 UT App 107, ¶ 19, 537 P.3d 258 (quotation simplified).

## ANALYSIS

### I. The Stalking Statute

¶30 Pursuant to the Utah Code, an individual (the petitioner) "who believes [he or she] is the victim of stalking may file a verified written petition for a civil stalking injunction against the alleged stalker with the district court." Utah Code Ann. § 78B-7-701(1)(a)(i) (LexisNexis 2022).[8] The district court may then issue an ex parte civil stalking injunction "[i]f the court determines that there is reason to believe that an offense of stalking has occurred." *Id.* § 78B-7-701(3)(a). If the individual against whom the ex parte injunction was entered (the respondent) subsequently requests a hearing on the matter, the petitioner must show by a preponderance of the evidence that the offense of stalking—as defined in the criminal code[9]—occurred.

---

8. Because the applicable provisions of the Utah Code in effect at the relevant time do not differ from those currently in effect in any way material to this appeal, we cite the current version of the code for convenience.

9. "While it may seem odd to discuss an 'offense' in a civil context, the stalking injunction statute borrows its definition from the criminal stalking statute. In other words, to obtain a civil stalking injunction, a petitioner must establish the elements necessary to meet the definition of stalking in the criminal code." *Anderson v. Deem*, 2023 UT App 48, ¶ 23 n.6, 530 P.3d 945 (quotation simplified). *See also* Utah Code Ann. § 78B-7-102(22) (LexisNexis Supp. 2023) (stating that the term "[s]talking" as used in the civil injunction context "means the same as that term is defined in" the stalking statute found in the criminal code).

*Id.* §§ 78B-7-102(22) (Supp. 2023), -701(4)(a), (5)(b) (2022). "At the hearing, the court may modify, revoke, or continue the injunction." *Id.* § 78B-7-701(5)(a).[10]

¶31     The stalking statute defines stalking, in pertinent part, as follows:

> An actor commits stalking if the actor intentionally or knowingly:
>
> (a) engages in a course of conduct directed at a specific individual and knows or should know that the course of conduct would cause a reasonable person:
>
>> (i) to fear for the individual's own safety or the safety of a third individual; or
>>
>> (ii) to suffer other emotional distress . . . .

*Id.* § 76-5-106.5(2) (Supp. 2023). Accordingly, stalking consists of two elements: (1) the respondent "must intentionally or knowingly engage in a course of conduct directed at" the petitioner and (2) the respondent "must know or should know that the course of conduct would cause a reasonable person to fear for the person's own safety or suffer other emotional distress." *Ragsdale I*, 2021 UT 29, ¶ 25, 491 P.3d 835 (quotation simplified). Under the second element, emotional distress is defined as "significant mental or psychological suffering, whether or not

---

10. If the respondent does not request a hearing, "the ex parte civil stalking injunction automatically becomes a civil stalking injunction without further notice to the respondent and expires three years after the day on which the ex parte civil stalking injunction is served." Utah Code Ann. § 78B-7-701(6)(c) (LexisNexis 2022).

medical or other professional treatment or counseling is required." Utah Code Ann. § 76-5-106.5(1)(a)(ii)(A). Both elements must be met before a district court may issue a civil stalking injunction. *Id.*

¶32 Here, only the second element is at issue—specifically, whether Fishler's course of conduct would have caused a reasonable person in Ragsdale's circumstances to suffer emotional distress.[11] Fishler contends that the district court erred in answering this question in the affirmative. We disagree.

¶33 The second element of the stalking inquiry imposes "an objective standard under which the subjective effect of the respondent's conduct on the petitioner is irrelevant." *Ragsdale I*, 2021 UT 29, ¶ 45 (quotation simplified). In other words, "a petitioner need only show that the respondent's conduct would affect a reasonable person in the petitioner's circumstances." *Id.* (quotation simplified). *See* Utah Code Ann. § 76-5-106.5(1)(a)(v) (defining "[r]easonable person" as "a reasonable person in the [petitioner's] circumstances"). "Courts must avoid succumbing to a purely subjective analysis, which is inconsistent with the objective standard's intent to protect against criminalizing conduct that only an unreasonably sensitive or paranoid

---

11. Fishler does not challenge the district court's determination regarding the mens rea aspect of this element, i.e., that he *knew or should have known* that his course of conduct would cause a reasonable person to suffer emotional distress. Also, because the stalking statute requires the petitioner to show the course of conduct would cause a reasonable person to fear for one's safety *or* to suffer emotional distress, *see* Utah Code Ann. § 76-5-106.5(2)(a)(i)–(ii) (LexisNexis Supp. 2023), and because we hold that Ragsdale satisfied the latter showing, we do not address Fishler's arguments challenging the district court's fear-for-safety determination.

[petitioner] would find harassing." *Baird v. Baird*, 2014 UT 08, ¶ 27, 322 P.3d 728 (quotation simplified).

¶34    "In applying this standard, courts must consider the entire context surrounding a respondent's conduct" as well as "the conduct cumulatively, accounting for the facts and circumstances of the individual case." *Ragsdale I*, 2021 UT 29, ¶ 45 (quotation simplified). "Courts applying this individualized objective standard have considered such factors as the [petitioner's] background, the [petitioner's] knowledge of and relationship with the [respondent], any history of abuse between the parties, . . . and the cumulative effect of [the respondent's] repetitive conduct." *Baird*, 2014 UT 08, ¶ 27 (quotation simplified). A court may also "consider whether the [respondent] had knowledge of a particular vulnerability of the [petitioner] and then acted with full knowledge of the [petitioner's] vulnerability." *Id.* (quotation simplified). Accordingly, "acts that seem perfectly innocent or even well intentioned may constitute stalking." *Id.* ¶ 26. For instance, "conduct such as sending the [petitioner] a dozen roses may seem benign and loving to the casual observer, but could mean a very different thing when understood in the context of the [petitioner's] experience." *Id.* (quotation simplified).

¶35    In the prior appeal in this matter, our Supreme Court held that the district court misapplied this standard when it concluded that, "in this day and age, exposure to pejorative gestures and profanity should not cause the type of emotional distress envisioned by the stalking statute." *Ragsdale*, 2021 UT 29, ¶ 46 (quotation simplified). The Court held that this conclusion did "not account for the cumulative impact of [Fishler's] behavior" over the years, nor did "it suggest that the court considered the fact that Mr. Fishler's conduct occurred where Ms. Ragsdale worked." *Id.* ¶ 47. Furthermore, the Court found "it hard to conclude that profane gestures and comments categorically could not" satisfy the second element of the stalking inquiry, *id.*, and it reiterated that "[t]o properly apply the stalking statute's objective

standard, the district court should have analyzed [Fishler's] conduct in light of the specific facts and circumstances of Ms. Ragsdale's individual case," *id.* ¶ 48. The Court "suggest[ed]" that, on remand, the district court consider the *Baird* factors, i.e., "the cumulative effect of the respondent's repetitive conduct, the petitioner's background, knowledge of and relationship with the respondent, and any history of abuse between the parties." *Id.* ¶ 49 n.40 (quotation simplified). *See Baird*, 2014 UT 08, ¶ 27.

¶36 On remand, the district court followed our Supreme Court's guidance, ultimately concluding "that there can be no question that a reasonable person in [Ragsdale's] circumstances would suffer emotional distress—meaning significant mental or psychological suffering—as a result of [Fishler's] conduct." In reaching this conclusion, the court considered the following circumstances:

- Fishler's conduct involved "constant yelling and mouthing obscenities and flipping off over the course of nearly 10 years in an otherwise quiet neighborhood, literally every time an ECA-affiliated individual crosses paths with" him;

- Ragsdale holds the position of "the owner of a business that is responsible for the safety and well-being of girls and young women who are living at a facility owned and operated by the business";[12]

---

12. Although the district court discussed some of these circumstances in the context of determining whether Fishler's course of conduct would have reasonably caused fear for one's safety or for that of others, the court indicated that the same course of conduct would have also caused emotional distress "[f]or substantially the same reasons."

- Ragsdale "wants her business to succeed" and Fishler's conduct posed a threat of "potential damage to her livelihood";

- Although Ragsdale did not witness every interaction between Fishler and ECA-affiliates, as the owner of ECA, she "is responsible for her employees and certainly for her clients, so it is reasonable for her to be aware of all such incidents," and her knowledge of Fishler's conduct toward others combined with "her additional knowledge that [Fishler] knew that she was aware, would only heighten the distress caused by [Fishler's] conduct";

- "[M]ost reasonable people would view [Fishler's] conduct as nearly, if not entirely, unhinged";

- Fishler was aware of the threatening comments made in the online petition when he posted the yard sign directing readers to the petition;

- "Although certainly not dispositive," Ragsdale and others at ECA suffered "severe emotional distress and anxiety" as a result of Fishler's conduct and almost all "became emotional" while testifying at the second evidentiary hearing; and

- Fishler "was fully aware of the effect his conduct was having on [Ragsdale] and others at ECA"—particularly after the first evidentiary hearing that was held in 2017.

¶37 The court was also unpersuaded by Fishler's contention that "the repetitive and consistent nature of [his] conduct over the years should have decreased any shock or discomfort that [Ragsdale] experienced," stating that such an assertion "is contrary to human experience and would effectively encourage a respondent to engage in stalking for as long as possible in order to argue that the petitioner should somehow be desensitized to

the conduct." The court similarly rejected Fishler's argument that any distress Ragsdale experienced from an errant belief that he was personally targeting her should have been alleviated by his testimony at the first evidentiary hearing that he was not targeting her and did not even know what she looked like until that hearing, that "the purpose of his conduct was to protest ECA's location in his neighborhood," and that he did not intend to cause anyone emotional distress. The court stated that it was not convinced that this prior testimony was "sufficient to mitigate the cumulative effect of his continual and obsessive harassment," and it further indicated that his argument implied "a 'but I don't mean any harm' defense that does not appear in the [stalking] statute."

¶38    Fishler contends that in reaching its emotional-distress determination, "the district court relied on the type of blanket conclusions that the Utah Supreme Court held to be a misapplication of the Stalking Statute." In particular, he asserts that some of the circumstances the court discussed as part of its analysis were subjective beliefs rather than objective matters, and that the court failed to reference the *Baird* factors in its analysis. We address each argument in turn.

¶39    Fishler contends that the district court's discussion of the actual emotional distress and anxiety suffered by Ragsdale and ECA staff "is exactly the kind of subjective analysis that *Baird* forbids the district court from engaging in." *See* 2014 UT 08, ¶ 25 ("Under the Stalking Statute's solely objective standard, the subjective effect of the respondent's conduct on the petitioner is irrelevant."). The district court indicated that this circumstance was "certainly not dispositive" in its analysis, and there were several other factors supporting the court's ultimate conclusion. Indeed, other than the one passing reference to subjective effect, the vast majority of the court's analysis was focused on the effect Fishler's conduct would have on a reasonable person in Ragsdale's circumstances. Additionally, the court did not consider the actual effect of the conduct on any single individual

but rather noted that *several* individuals were similarly affected by the same conduct. In this context, the subjective effect could be relevant to the individualized objective analysis mandated by *Baird* and its progeny. Specifically, the fact that several individuals suffered emotional distress from the same conduct would tend to support a finding that a reasonable person in the same circumstances would suffer emotional distress—as opposed to distress "only an unreasonably sensitive or paranoid" petitioner would suffer. *Id.* ¶ 27 (quotation simplified). And as discussed in greater detail below, the actual negative impact of the conduct on ECA staff is also relevant to the individualized objective analysis in that the conduct likely affected the business and work environment for which Ragsdale was directly responsible.

¶40 The district court also considered the relevant *Baird* factors. The court certainly considered Ragsdale's background as the operator of a business at which girls and young women experiencing mental health issues resided and her accompanying responsibility toward ECA's staff and residents. *See id.* And due to her position, she was aware of not only her own interactions with Fishler, but also of the interactions others at ECA had with him. Several ECA staff members suffered "severe emotional distress and anxiety" as a result of Fishler's 10-year course of conduct, thereby negatively affecting the business and work environment for which Ragsdale was directly responsible.[13] Accordingly, regardless of whether Fishler's course of conduct was aimed at Ragsdale personally or ECA more generally, the

---

13. For this same reason we reject Fishler's argument that the district court failed to explain how a reasonable person would suffer emotional distress when he was "not specifically singling Ragsdale out." The court explicitly discussed the effect of his conduct on Ragsdale's business and thereby on her as part of its analysis.

effect of his conduct—particularly as it unceasingly spanned a 10-year period—could certainly cause a reasonable person in Ragsdale's position to suffer emotional distress.

¶41 The court also considered the potential damage Fishler's course of conduct posed to the business and Ragsdale's livelihood. *See Baird*, 2014 UT 08, ¶ 27; *State v. Miller*, 2021 UT App 88, ¶ 22, 496 P.3d 282 ("Damage to one's reputation, relationships, or livelihood would cause a reasonable person to suffer emotional distress regardless of whether the communications that caused the damage are ever relayed to the victim."), *aff'd*, 2023 UT 3, 527 P.3d 1087. Fishler takes issue with the court's consideration of this factor, arguing that Ragsdale never presented evidence that his conduct actually resulted in loss of revenue or otherwise harmed her business. But the court discussed the "potential damage to [Ragsdale's] livelihood," and Fishler has not presented argument as to why a court should be limited to considering only actual damage to one's livelihood. To the contrary, the fear of potential damage to one's livelihood could certainly cause a reasonable person to suffer emotional distress. *Cf. Miller*, 2023 UT 3, ¶ 112 n.9 (stating that a reasonable person could suffer emotional distress "from a fear of being fired"). And here, where ECA is in the business of caring for girls and young women experiencing mental health issues, the presence of a man yelling or mouthing profanities at many ECA-affiliated individuals, including residents and prospective residents, certainly could negatively affect the business—at the very least, one could reasonably fear that it would.

¶42 Finally, the court evaluated the cumulative impact of the several circumstances it considered, particularly as they persisted over a 10-year period. *See Baird*, 2014 UT 08, ¶ 27. Fishler takes issue with the court's rejection of his argument that "any shock or discomfort that [Ragsdale] experienced" should have decreased over time. He asserts that the court's statement that this argument was "contrary to human experience" and would incentivize

stalkers to prolong the act of stalking "ignored the *Baird* factors and [*Ragsdale I*'s] admonishment that the district court's review be limited to an objective analysis of Ragsdale's specific circumstances." But the court was addressing the *Baird* factors when it considered the cumulative effect of Fishler's decade-long conduct.

¶43 Furthermore, the court's rejection of this argument does not negate the fact that the court addressed the specific circumstances of this case. The court's conclusion is supported by the fact that several ECA employees, whom the court found to be "particularly credible," became visibly emotional while testifying regarding the "severe emotional distress and anxiety" they suffered as a result of Fishler's conduct. As discussed above, this evidence of several individuals suffering emotional distress from the same conduct supported the court's finding regarding whether a reasonable person in Ragsdale's circumstances would suffer emotional distress.

¶44 For these reasons, the district court did not clearly err in finding that a reasonable person in Ragsdale's circumstances would suffer emotional distress as a result of Fishler's course of conduct.

## II. The First Amendment

¶45 The First Amendment to the United States Constitution, which is made "applicable to the States through the Fourteenth Amendment," *Miller v. California*, 413 U.S. 15, 25 (1973), "prohibits any law 'abridging the freedom of speech,'" *Butt v. State*, 2017 UT 33, ¶ 17, 398 P.3d 1024 (quoting U.S. Const. amend. I). "This protection extends to all ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion." *Id.* (quotation simplified). "Political speech enjoys the broadest protection under the First Amendment." *Ragsdale I*, 2021 UT 29,

¶ 51, 491 P.3d 835 (quotation simplified). *See Boos v. Barry*, 485 U.S. 312, 322 (1988) ("In public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (quotation simplified); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (stating that "debate on public issues should be uninhibited, robust, and wide-open").

¶46 Nevertheless, "in appropriate circumstances, courts may still enjoin speech that meets the definition of stalking even if it has a political objective." *Ragsdale I*, 2021 UT 29, ¶ 51. *See id.* ¶ 55 ("[T]he acknowledgement of a respondent's right to free speech is just the starting point in assessing whether part of that right must yield to the governmental interests underlying the stalking statute."). *See also United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("When speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.") (quotation simplified). Thus,

> courts may issue civil stalking injunctions under specific, statutorily defined parameters. These parameters include enjoining respondents from committing stalking and restraining respondents from coming near a petitioner's residence or place of employment. They also include enjoining respondents from contacting, directly or indirectly, the petitioner, the petitioner's employers, employees, fellow workers, and others with whom communication would be likely to cause the petitioner annoyance or alarm. In addition, courts may grant any other relief necessary or convenient for the protection of the petitioner and other specifically designated persons under the circumstances.

*Ragsdale I*, 2021 UT 29, ¶ 52 (quotation simplified). In assessing whether a civil stalking injunction violates the respondent's free speech rights, district courts must, "at a minimum, determine whether each provision of a proposed injunction is content-based or content-neutral, and evaluate each provision under the corresponding level of scrutiny." *Id.* ¶ 55.

¶47    A content-based restriction "stifles speech on account of its message." *Turner Broad. System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). In other words, a restriction is content-based "if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred" or if it is "concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech." *McCullen v. Coakley*, 573 U.S. 464, 479, 481 (2014) (quotation simplified). This "extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Burson v. Freeman*, 504 U.S. 191, 197 (1992). Additionally, restrictions that appear content-neutral on their face are treated as content-based if they "cannot be justified without reference to the content of the regulated speech" or if they "were adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (quotation simplified). Content-based restrictions are presumptively unconstitutional, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and are accordingly "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech," *Reed*, 576 U.S. at 165 (quotation simplified). Such restrictions overcome strict scrutiny only if "they are narrowly tailored to serve compelling state interests." *Id.* at 163. In the strict-scrutiny context, a restriction is narrowly tailored if it is "the least restrictive means to further the articulated interest." *Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).

¶48    Conversely, a restriction is content-neutral so long as it is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation simplified). Content-neutral restrictions are subject to the "less stringent standard" of intermediate scrutiny.[14] *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (quotation simplified). *See O'Brien*, 391 U.S. at 377. A restriction withstands intermediate scrutiny if (1) "it furthers an important or substantial government interest," (2) "the governmental interest is unrelated to the suppression of free expression," and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."[15] *O'Brien*, 391 U.S. at 377. "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner Broad. System*, 512 U.S. at 662 (quotation simplified). "Narrow tailoring in this context requires, in other words, that the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (quotation simplified).

---

14. Another category of content-neutral restrictions on speech is time, place, and manner restrictions in a public forum. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Neither party has suggested that this category is applicable here.

15. This is the standard that the district court applied in this case upon concluding that the No Contact Order and the Personal Conduct Order provisions of the proposed civil stalking injunction were content-neutral. Because neither party has advocated a different standard on appeal, we apply the *O'Brien* standard here as well.

¶49    On appeal, Fishler challenges the No Contact Order and the Personal Conduct Order provisions of the civil stalking injunction entered against him.[16] On cross-appeal, Ragsdale challenges the district court's rejection of a proposed provision ordering Fishler to additionally remove the yard signs from his property and enjoining him from putting up similar signs in the future. We thus proceed to "evaluate each provision under the corresponding level of scrutiny." *Ragsdale I*, 2021 UT 29, ¶ 55.

A.    The No Contact Order

¶50    The No Contact Order directs Fishler as follows:

> Do not contact, phone, text, mail, e-mail or communicate either directly or indirectly in any way with [Ragsdale]. Do not contact, communicate with, or gesture to others as they enter or exit [ECA] or while they are located on the ECA premises.

The district court held that this provision "is content-neutral because the provision is not concerned with and does not draw any distinction based on any message conveyed by" Fishler; that "the stalking statute furthers an important and substantial governmental interest in protecting Utah citizens from emotional distress and other harm as a result of stalking"; and that the

---

16. Fishler argues that "the district court failed to perform either a strict scrutiny or an intermediate scrutiny analysis regarding the constitutionality of applying the Stalking Statute to prohibit Fishler's conduct." But that is exactly what the district court did in this case. It followed our Supreme Court's directive that courts, in the civil application of the stalking statute, should "determine whether each provision of a proposed injunction is content-based or content-neutral, and evaluate each provision under the corresponding level of scrutiny." *Ragsdale I*, 2021 UT 29, ¶ 55, 491 P.3d 835.

provision "does not burden more speech than necessary to accomplish the goal of protecting [Ragsdale] from being stalked." We largely agree with the district court's analysis.

¶51 This provision is content-neutral as it prohibits Fishler from contacting Ragsdale and others on, entering, or leaving ECA property in any way—regardless of the substance of the message. *See Ward*, 491 U.S. at 791. The provision thus does not distinguish a friendly wave "hello" from the rude hand gestures Fishler frequently employed. Indeed, a determination of whether a violation of the No Contact Order occurred would stop after it was determined that Fishler directed a communication toward a person identified by the provision—it would not turn on the substance of the communication or on its effect on the person whatsoever. *See McCullen*, 573 U.S. at 479, 481.

¶52 Furthermore, the No Contact Order is substantially similar to the injunction at issue in *Towner v. Ridgway*, 2008 UT 23, 182 P.3d 347, which our Supreme Court held passed First Amendment muster. *See id.* ¶ 20. There, paragraph three of the challenged civil stalking injunction enjoined the respondent "from contacting [the petitioner], directly or indirectly through any form of communication including written, oral, or electronic means and restrain[ed] him from contacting [the petitioner's] family members through any of these means." *Id.* (quotation simplified). Paragraph four of the injunction directed that the respondent was "free to post communications on electronic media so long as the posting represents commentary on the substance of political positions taken by [the petitioner], otherwise, [the respondent] is enjoined from making comments directed at [the petitioner] or his family that are designed to harass or annoy." *Id.* ¶ 19 (quotation simplified). On appeal, the respondent argued that paragraph four constituted "a content-based restriction on his speech in violation of the First Amendment." *Id.* Based on the petitioner's "concession that paragraph four merely repeats paragraph three of the injunction" and that both provisions

merely enjoined the respondent from communicating *to* the petitioner and his family and did not enjoin the respondent from communicating *about* the petitioner to others, our Supreme Court held that the injunction did not violate the First Amendment. *Id.* ¶ 20.

¶53 In substance, the No Contact Order is almost identical to the injunction our Supreme Court affirmed in *Towner*. Indeed, there is no meaningful distinction between the two. Both provisions prohibited any communication, either direct or indirect, from the respondent to the petitioner or other identified individuals (the petitioner's family members in *Towner*, and individuals directly engaging with the ECA premises in this case).[17] As with the provisions at issue in *Towner*, nothing in the No Contact Order precluded Fishler from expressing his opinions—political or otherwise—about the presence of ECA in his neighborhood to others not identified by the No Contact Order. And as discussed above, enforcement of this provision is entirely independent of the message contained in the communication. For these reasons, *Towner* is binding on this case, and the No Contact Order therefore withstands Fishler's First Amendment challenge.[18]

¶54 For these reasons, we affirm the No Contact Order the district court entered against Fishler.

---

17. Fishler has not argued that the identified family members in *Towner* are distinguishable in any meaningful manner from the "others" identified by the No Contact Order. Indeed, his argument on appeal does not specifically address that portion of the No Contact Order.

18. Because *Towner* is binding, we do not engage in a more fulsome intermediate scrutiny analysis.

B. The Personal Conduct Order

¶55 The other provision contained in the civil stalking injunction is the Personal Conduct Order, which directs Fishler as follows:

> Do not stalk [Ragsdale]. This means you must not follow, threaten, annoy, harass, or cause distress to [Ragsdale]. For a legal definition of stalking, *see* Utah Code 76-5-106.5.

As with the No Contact Order, the district court held that this provision "is content-neutral because it does not draw any distinction based on any message conveyed by" Fishler and that the provision "does not burden more speech than necessary to accomplish the goal of protecting [Ragsdale] from being stalked." We disagree with this analysis. Although certain actions enjoined by this provision are not entitled to First Amendment protection, other actions constitute expressive conduct, the prohibition of which, in this context, does not withstand strict scrutiny.

¶56 In defining "stalking," the Personal Conduct Order identifies several actions: following, threatening, annoying, harassing, and causing distress. As an initial matter, the First Amendment protects only expressive conduct. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) (stating that the "alleged communicative element" of the conduct at issue in that case—burning a selective service registration certificate—"is sufficient to bring into play the First Amendment"). There is not a "limitless variety of conduct [that] can be labeled 'speech' [just because] the person engaging in the conduct intends thereby to express an idea." *Id.* Rather, the First Amendment protects conduct in which "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974). Here, in the context of the

Personal Conduct Order, the act of following Ragsdale cannot be said to have a great likelihood of conveying a message that would be understood by others. Accordingly, the prohibition against following Ragsdale does not warrant any further First Amendment scrutiny.

¶57 Similarly, true threats are a category of speech that has historically fallen outside the bounds of First Amendment protection. *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id.* They "subject individuals to fear of violence and to the many kinds of disruption that fear engenders." *Id.* (quotation simplified). The Utah criminal code defines harassment as "communicat[ing] a written or recorded threat to commit a violent felony." Utah Code Ann. § 76-5-106(2) (LexisNexis Supp. 2023). This definition squarely aligns with the definition of true threats. Thus, to the extent the Personal Conduct Order's prohibition of threatening or harassing Ragsdale falls within the parameters of true threats, it too withstands Fishler's First Amendment challenge.[19]

¶58 Lastly, we turn to the prohibition against annoying or causing distress to Ragsdale. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). *See United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 811–12 (2000) (holding that a restriction is content-based if it "focuses *only* on the content of the speech and the direct impact that speech has on its listeners") (emphasis in original; quotation otherwise simplified); *United States v. Cassidy*, 814 F. Supp. 2d 574, 584 (D. Md. 2011) ("Typically, a restriction is content-based if it regulates speech based on the effect that speech has on an audience."). And here,

---

19. Moreover, any threatening or harassing behavior that falls short of these definitions may very well still be enjoined by the injunction through the No Contact Order.

the prohibition on annoying and causing distress focuses solely on the impact any speech or expressive conduct by Fishler would have on Ragsdale—Ragsdale's reaction is the only means by which it may be determined whether what Fishler did annoyed or caused distress. Accordingly, this prohibition is content-based.

¶59    Furthermore, the prohibition against annoying or causing emotional distress to Ragsdale does not withstand strict scrutiny because, in the context of this case, it is not the least restrictive means of furthering "the state's compelling interest in protecting its citizens from threatening or harmful behavior." *Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct. App. 1997), *superseded on other grounds by statute as recognized in Baird v. Baird*, 2014 UT 08, 322 P.3d 728. *See Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). In light of the No Contact Order, Fishler is already enjoined from contacting Ragsdale in any manner either directly or indirectly. The additional prohibition against annoying or causing distress could potentially enjoin Fishler from talking about Ragsdale (or ECA more generally) to others. For example, any appearances Fishler might make before the local governing authorities to complain about ECA's presence in his neighborhood could likely cause Ragsdale, as the owner of ECA, emotional distress or would, at the very least, annoy her. Given the facts of this case, the No Contact Order is sufficient to address the complained-of course of conduct, and these additional prohibitions in the Personal Conduct Order go beyond what is necessary. *See Towner v. Ridgway*, 2008 UT 23, ¶ 20, 182 P.3d 347 (holding that the civil stalking injunction did not violate the First Amendment because it enjoined the respondent from communicating directly to the petitioner but did not enjoin him from speaking about the petitioner).

¶60    We therefore remand this matter to the district court to modify the Personal Conduct Order in a manner consistent with this opinion.

C.      The Proposed Provision

¶61     The district court rejected the following provision proposed by Ragsdale:

> [Fishler] shall take down the signs currently posted on his property and refrain from posting any additional signage on his property that he knows or reasonably should know threatens, annoys, harasses, communicates to, or otherwise causes [Ragsdale] distress.

The court held that this proposed provision constituted a content-based restriction on speech "because whether any particular sign would be prohibited by the injunction cannot be determined without reference to and evaluation of the content or subject matter of the sign and, therefore, [it is] subject to strict scrutiny." The court further held that the provision did not withstand strict scrutiny, particularly "given the other provisions of the stalking injunction."

¶62     On cross-appeal, Ragsdale argues that the court erred in holding that the proposed provision constituted a content-based restriction on speech. She asserts that the proposed provision is content-neutral because the three signs currently on Fishler's property (two in the front yard and one in the back yard) constitute a communication directed at Ragsdale and anyone else on the ECA property. In support, she points to Fishler's testimony at the first evidentiary hearing. When asked why the yard signs were "sort of in that small location there" and were not "really big and in the middle of [his] yard," Fishler responded, "Well, we don't want to disturb our other neighbors and be obtrusive to our neighbors." Ragsdale also points to the testimony of Fishler's wife, who disagreed with the assertion that only those coming and going from the ECA property could see the signs, stating that "[t]hey are visible to anybody who looks at them," but she also

acknowledged that the signs "are more oriented to primarily address the business."

¶63 The phrasing of the proposed provision does not follow Ragsdale's argument. The provision indicates that the reason for the removal of the signs is that they threaten, annoy, harass, communicate to, or otherwise cause Ragsdale distress. As concerns the prohibition against annoying or causing Ragsdale distress, for the same reasons articulated in Part II.B. above, this constitutes a content-based restriction on Fishler's speech.[20]

¶64 Moreover, as concerns the prohibition against communicating to Ragsdale, the district court made no finding regarding whether the signs were communications directed at Ragsdale and the other identified persons.[21] It is telling that the testimony to which Ragsdale points is from the first evidentiary hearing, held before the prior judge, and that similar testimony was not elicited at the second evidentiary hearing.[22] Following the

---

20. Because Ragsdale has not alternatively challenged the district court's conclusion that the proposed provision does not withstand strict scrutiny, we end our analysis at the conclusion that the proposed provision was content-based.

21. Additionally, the three signs that remain on Fishler's property—two suggesting that one can become "disabled" for $10,000 per month and one stating, "DELIVER US FROM EVA"—cannot be said to constitute true threats. *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

22. The district court did review the transcript from the first evidentiary hearing and even referenced some of Fishler's prior testimony in its findings of fact and conclusions of law. But the point remains that it does not appear that the issue of whether the signs constituted direct communications to Ragsdale was at the

(continued…)

second evidentiary hearing, the court addressed the signs in the larger context of the proposed provision—it does not appear that the court was asked to make a specific finding regarding whether the signs were communications directed at Ragsdale. Indeed, in rejecting the provision, the court noted that "[b]y not enjoining the posting of any particular signage," it was not suggesting "that the posting of a sign(s) cannot constitute stalking and/or that it is permitted by the injunction." In other words, the court indicated that even without the inclusion of the proposed provision, it was possible that certain signs might still be enjoined through the provisions that ultimately made it into the civil stalking injunction. But absent a finding that the signs currently on the property violated the No Contact Order or the portions of the Personal Conduct Order that withstand First Amendment challenge, an order directing Fishler to remove the signs currently on his property is inappropriate.

¶65    In sum, we affirm the inclusion of the No Contact Order in the civil stalking injunction in its entirety as well as the district court's decision not to include the proposed provision regarding yard signs. We remand the matter, however, for the district court to make alterations to the Personal Conduct Order consistent with this opinion.

### III. Attorney Fees

¶66    The Utah Code provides that in the civil stalking injunction context, "[a]fter a hearing with notice to the affected party, the court may enter an order requiring any party to pay the costs of the action, including reasonable attorney fees." Utah Code Ann. § 78B-7-701(14) (LexisNexis 2022). In *Ragsdale I,* 2021 UT 29, 491 P.3d 835, our Supreme Court indicated that this statute grants district courts "broad, discretionary authority over attorney fee

---

forefront of the second evidentiary hearing—as demonstrated by the lack of similar testimony being elicited at the second hearing.

awards." *Id.* ¶ 59 (quotation simplified). The Court then listed several "nonexclusive" factors district courts should consider when deciding whether to award attorney fees under this and similarly-worded statutes:

> (a) the reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons in the bringing or conduct of the litigation.

*Id.* ¶ 60 (quotation simplified). *See id.* ¶ 61. The Court further indicated that "it may be appropriate for a district court to award fees to a petitioner when it would indemnify them from the costly, complicated, and discretionary process of obtaining a civil stalking injunction." *Id.* ¶ 62 (quotation simplified). But an attorney fees award "may not be appropriate if it imposes financial hardship on a respondent or would be otherwise inequitable." *Id.*

¶67 Here, in denying Ragsdale's request for attorney fees, the district court analyzed each of these factors. First, the court determined that both parties presented reasonable claims and arguments, and that although Ragsdale ultimately prevailed, Fishler's legal arguments "were certainly not without merit." Second, "for substantially the same reasons," the court found that neither party unnecessarily prolonged the litigation, and instead "both parties vigorously sought to protect their rights and advocate for their respective legal positions." Third, the court stated it was "not persuaded that either party would suffer unduly if forced to bear the financial burden" of their own attorney fees, nor that either party was better positioned to bear the other's attorney fees. Fourth, the court determined that

Ragsdale was the prevailing party because she "unquestionably and fully prevailed in the material relief she sought," i.e., obtaining the civil stalking injunction. Finally, the court stated that it had not been presented with any evidence suggesting that Fishler "or his attorney ever acted in bad faith, vexatiously, wantonly, or for oppressive reasons in their conduct of the litigation," and the court further noted that it had not personally observed them acting in such a manner. To the contrary, the court noted that all parties acted "professionally and civilly within the litigation itself." And although the court found Fishler's underlying course of conduct that resulted in the civil stalking injunction to be "obsessive and unreasonable," the court stated that this behavior did not extend to the ensuing litigation. Based on this analysis of the factors, the court concluded that "justice and equity do not favor an award of fees and costs."

¶68   Ragsdale argues that the district court should have found more factors weighing in her favor. Alternatively, she argues that even though the court found that four of the factors did not weigh in either party's favor, one factor—that she was the prevailing party—weighed in her favor and thus the court abused its discretion in not awarding her attorney fees.

¶69   The party asserting abuse of discretion bears the "heavy burden" of showing that "no reasonable person would take the view adopted by the trial court." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (quotation simplified). *See Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶¶ 21, 24, 361 P.3d 703 (Orme, J., concurring, joined by Toomey, J.) (stating that "standards of review really do matter" and that under the abuse of discretion standard, appellate courts must affirm cases even when other judges might have ruled differently, so long as the district court's decision is "within the broad range of discretion entrusted to" it), *cert. denied*, 369 P.3d 451 (Utah 2016). Ragsdale has not satisfied this burden.

¶70 This matter presented multiple complicated legal issues, several of which implicated the First Amendment—a particularly intricate area of the law. Neither party's legal positions lacked merit, and although Ragsdale ultimately prevailed by obtaining a civil stalking injunction, it was not unreasonable for the court to decline to award attorney fees where both sides vehemently defended their respective rights[23]—particularly where in the context of the litigation the parties were, by the district court's assessment, civil and professional and did not unnecessarily prolong the litigation. In light of all this, we cannot say that the district court's denial of Ragsdale's motion for an award of attorney fees exceeded the bounds of reasonableness.[24]

---

23. In addressing the factor of whether the litigation was unnecessarily prolonged, the district court additionally noted that "[i]t is certainly true that [Fishler] could have ceased his conduct, but so too could [Ragsdale] have abandoned her efforts to enjoin [Fishler]." Ragsdale takes issue with this statement, asserting that the district court was equating Fishler's nonexistent "right to stalk" with her "right to protect herself from stalking under the Stalking Statute." But it is much more likely that the court was referencing Fishler's perceived First Amendment right to free speech—it does not appear that Fishler ever asserted a "right to stalk."

24. Ragsdale also seeks an award of attorney fees reasonably incurred on appeal. "Generally, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 38, 405 P.3d 807 (quotation simplified), *cert. denied*, 409 P.3d 1047 (Utah 2017). But because Ragsdale was denied attorney fees below—which denial we affirm on appeal—we deny her request.

CONCLUSION

¶71    The district court did not err in concluding that Fishler's course of conduct would cause a reasonable person in Ragsdale's circumstances to suffer emotional distress. The No Contact Order does not violate the First Amendment, and the district court did not err in rejecting on First Amendment grounds the proposed provision regarding yard signs. But because part of the Personal Conduct Order is content-based and does not withstand strict scrutiny, we reverse and remand the matter so that the court may modify that provision consistent with this opinion. Lastly, the court did not abuse its discretion when it denied Ragsdale's motion for attorney fees.

¶72    Affirmed in part, and reversed and remanded in part.

———————